[No. 4130.]

## UNION PACIFIC RAILROAD COMPANY V. LIBBY ET AL.

1. PLEADING—*Motion to Make More Specific—Discretion.* Complaint for injuries to plaintiff's live stock while being transported upon defendant's train. Considering that defendant's agents were in charge of the train, and must have had full knowledge as to how it was operated, *held* not a violation of discretion to deny a motion to make the complaint more specific. (113.)

2. COMMON CARRIER—*Connecting Carriers.* Action for injuries to live stock while being transported upon defendant's train, and which it received from a prior carrier in the line. There was evidence that ten out of one hundred and ninety-two animals died, while in the possession of the former carrier, and plaintiff testified that the ''jerking'' of the cars upon the line of the former carrier would affect them some.

Defendant's agent, sworn in his behalf, expressed the opinion that one hundred and eighty-two animals delivered to defendant ''were all in fair condition'' at the time of such delivery. *Held*, there was no substantial evidence to support the contention that any mismanagement of the train of the first carrier contributed to the subsequent death or injury of the animals delivered to defendant. (114.)

3. NEGLIGENCE—*Contract Exempting Carrier* from liability for his own negligence, or that of his agents, is prohibited by law. (114.)

The evidence examined and held sufficient to charge defendant with negligence in the management of its train, while conveying plaintiff's live stock, and and to exonerate plaintiff from the charge of contributory negligence. (116, 117.)

*Error to Logan District Court.* HON. H. P. BURKE, Judge.

Messrs. HUGHES & DORSEY and Mr. JOHN Q. DIER, for plaintiff in error.

Mr. JAS. R. PATTERSON and Messrs. MUNSON & MUNSON, for defendants in error.

BELL, J.

The defendants in error, Libby & Day, plaintiffs in the trial court, hereinafter called plaintiffs, on October 3rd, 1910, at McGill Junction, Nevada, delivered 192 Nevada range horses to the Nevada Northern Railway Company

for through shipment to Kansas City, Missouri, over the lines of said company, the Southern Pacific Company, and the Union Pacific Railroad Company, by way of Sterling, Colorado, under a feed and transit billing, which permitted them to receive such of said horses that survived from said Union Pacific Railroad Company at Sterling aforesaid. The plaintiffs claim that, by reason of the negligent and rough handling of the cars of the plaintiff in error, the Union Pacific Railroad Company, hereinafter called defendant, ten of said horses were killed before they were deliverd at said town of Sterling; that fifteen more thereof were in such crippled condition when they reached Sterling that they were utterly worthless, and died within a few days afterward; and that ten of said 192 horses were killed on the cars of the Southern Pacific Company, but plaintiffs do not hold defendant in anywise responsible for this loss. It is also charged that one gaited saddle horse escaped, or was taken from the yards used by the defendant company at Laramie, Wyoming, or from the train between there and Sterling, Colorado, and that the 156 survivors were damaged in the sum of $5 each by reason of the negligent and rough handling of the cars in which they were shipped. The case was tried to a jury in the Logan County District Court before Judge Burke, and resulted in a verdict for the plaintiffs, upon which judgment was entered for the sum of $1470.

The defendant contends that this judgment is not legally authorized for some forty-nine reasons set up in the assignments of error; but we will herein consider only a very few of the most serious complaints.

It is insisted that the trial court erred in denying the application of the defendant that the complaint be made more specific in material particulars, and a later application for a bill of particulars. The complaint is not a model in the way of giving a clear and concise statement of the facts relied upon; and while it might have been a commendable

exercise of a wise discretion had the court granted the former application, nevertheless, as the agents of the defendant were in charge of the train transporting these horses and, from the very nature of things, should have known whether the cars were run with reasonable care, we do not think the court committed reversible error in overruling these applications.

The 192 horses were shipped from McGill Junction to Cobre in Nevada, over the Nevada Northern Railway, and over the Southern Pacific Railroad from Cobre to Ogden, Utah, killing ten of them on the way. The 182 horses surviving were delivered to the defendant at the last mentoined point, and were transported by it to Sterling, Colo., less one lost at Laramie, Wyoming, or between this point and Sterling, Colo., and 25 were killed in transit by the defendant company, or were so injured that they died shortly after their arrival at Sterling. In the billing contract, the value of these horses was limited to $30 each. It is persistently urged by the defendant that the horses that died were injured by the railroad companies moving them from McGill Junction to Ogden, Utah, before it accepted the surviving 182 horses for further shipment to Sterling, Colo.; that plaintiffs did not sufficiently identify the extent of the injury done to the shipment by the Southern Pacific Company that the same might be separated from that alleged to have been done by the defendant company, and that, therefore, no legal recovery can be had against it.

Plaintiff Day was asked:

"Would this jerking (of the cars) that you have spoken of between Cobre and Ogden result in injury to the horses that survived to reach Ogden alive?" A. "Well, it would affect them some of course."

The defendant's witness, William Whitlock, superintendent of the stock yards in which the horses were inspected, fed, watered and rested for 24 hours in Ogden, testified that his record showed that the horses were down,

and in bad shape; that 7 were dead, and 3 died in the yards; that they shipped out 182 that he thought were all in fair condition; that he had no record of them being otherwise; and that he did not notice any difference in these shipped out from those in former shipments made by the plaintiffs.

While it seems quite probable that some of the 182 horses shipped from Ogden may have been seriously injured before reaching there, yet there is no substantial evidence in support of any such assumption, notwithstanding plaintiff Day testified under cross-examination that the jerking and rough handling of the cars "would affect them some of course." He might well have said that driving them from the range to the cars "would affect them some." There is, however, no substantial evidence from any source that the rough handling of the cars of the Southern Pacific Company contributed toward the death or permanent injury of any of the horses shipped over the defendant's line.

Plaintiff Day testified that the gaited saddle horse was lost or allowed to escape by the defendant at Laramie, Wyo., or somewhere between that place and Sterling, Colo. He testified that he saw him for the last time at Laramie and that he was not among the dead ones there. Mr. W. C. Thomas, a lessee of the Laramie stock yards, testified that every horse delivered at Laramie, except the dead ones, were reloaded and shipped out of that station, and that he was positive that no horse was stolen or escaped from the stock yards at Laramie, as the yards were kept locked and in charge of one of his men at all times, except when they were moving in hay. Day testified that the stock yards were not kept locked. Defendant contends that, if said gaited saddle horse escaped or was lost, the plaintiffs, by special contract and for valuable consideration, assumed the responsibility for such loss. It seems to be the settled public policy of this state that a common carrier may not, by special contract, exempt itself from or evade its common law liability for the consequences of its own negligence or

that of its agents. *Union Pacific Railway Company v. Rainey,* 19 Colo., 225, 34 Pac., 986; *Adams v. The Colorado & Southern Railway Company,* 49 Colo., 475, 478, 113 Pac., 1010, 36 L. R. A. (N. S.) 412. Therefore we do not think defendant should be relieved from the payment of the contract value of $30 for the loss of the gaited saddle horse, if it was lost or allowed to escape as testified to by plaintiff Day.

It is urged that plaintiffs were guilty of contributory negligence in shipping some crippled or injured horses from Laramie, Wyo., to Sterling, Colo., over a run which is conceded to have been made with due care. Day testified that he knew that every horse loaded at Laramie would be in pretty bad shape when they got to Sterling, and that if they had been all right at Laramie they would have been all right at Sterling; that he thought two died between Laramie and Sterling from exhaustion; that he had been shipping horses of the same kind from the same range for a long time; and that from 3 to 4 to a 6-car shipment was the usual loss. Thomas, the manager of the stock yards at Laramie, a witness for defendant, testified that he unloaded the horses there; that he gave them the usual inspection, which was a very close one; that they were in very poor condition; and that he reloaded them, including 8 crippled ones. He expressed his opinion that their bad condition was caused by a lack of feed and water for some time previous to their arrival at the Laramie yards; he considered them trapped horses from Nevada, necessary to be gagged and hobbled to be gotten to the railroad station; he stated that they had bruises on their legs, feet and ankles; and he thought that the evidences on them showed that they had been hobbled within a month of their arrival in Laramie. We know of no other description of the 8 crippled ones. Day testified that they hobbled none of them, and had no trouble whatever in driving them from the range to the railroad station in Nevada, or in loading

them; but admitted that some of them had their legs skinned more or less, or were rubbed in the cars. Some of the witnesses for defendant testified that, when they saw the horses at the different stations along the line, they were thinner and in worse condition than horses they had seen in former shipments by plaintiffs, while other witnesses for defendant, as well as the witnesses for plaintiffs, testified that they were in the usual condition of horses formerly shipped from the same range by the same parties, when they were loaded at McGill Junction. Day, who accompanied the shipment, testified that the trainmen handled the train with unusual roughness; that they made frequent stops and starts, with such jerks that the cars at times were broken, the horses thrown from their feet and piled upon one another; that he protested and appealed in vain to the employees to be more careful; and he attributed the weakened condition of the horses to such rough handling and negligent management of the train.

The evidence as herein reviewed was submitted to the jury under instructions from the court to the effect that, before the plaintiffs could recover, it must appear from the evidence that they, themselves, were free from negligence, and that if the jury found that a portion of the damages alleged to have been suffered was due to causes for which the defendant was liable, and a portion was due to causes for which the defendant was not liable, and if they were unable to determine from the evidence what portion was caused from the negligence of the defendant, then their vrdict should be for the defendant; and further, that under no condition could plaintiffs recover in excess of $1560, the aggregate amount of $30 per head for the horses killed on defendant's line, and $5 per head damages for those that survived. However, the jury returned a verdict for only $1470, and it is argued by counsel for plaintiffs that by subtracting $90, the contract value of 3 horses, the usual loss on like shipments, from the full amount authorized

under the evidence and the instructions of the court, the difference would equal the sum of $1470, the amount of the verdict returned. However, we do not pretend to say how the jury arrived at their verdict, but they returned such a verdict as was authorized under the conflicting evidence and the instructions of the court. It is the special province of the jury to hear the evidence and determine the weight thereof. They met the witnesses face to face, heard them detail the facts attending this shipment, and we do not think there is anything in the record before us that would justify us in reversing the judgment because the verdict is not sufficiently supported by the evidence.

Defendant's counsel, with considerable industry, clearness and ability, have forcibly urged here many legal positions that they unavailingly pressed before the trial court, but after due consideration thereof, we are of the opinion that the trial court committed no such errors in applying the law at the trial as warrant a reversal of the judgment; hence, the same is affirmed.

*Affirmed.*